

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ORIGINAL
D + F
C / M

-------------------------------------------------------------x

IN RE AIR CRASH NEAR NANTUCKET
ISLAND, MASSACHUSETTS, ON OCTOBER
31, 1999

**MEMORANDUM & ORDER**
Case No. 00-MDL-1344
No. 02-CV-2540 (FB)

-------------------------------------------------------------x
-------------------------------------------------------------x

THE BOEING COMPANY,

            Plaintiff,

    -against-

EGYPTAIR, and MISR INSURANCE,

            Defendants.

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT. E.D.N.Y.
★   OCT 0 7 2003   ★

P.M. _____
TIME A.M. _____

-------------------------------------------------------------x

*Appearances:*
*For Plaintiff:*
SCOTT F. SEABLOM, ESQ.
Perkins Coie LLP
1201 Third Avenue
Seattle, WA 98101

*For Defendant MISR:*
FREDERICK ALIMONTI, ESQ.
Alimonti Law Offices
202 Mamaroneck Avenue
Suite 500
White Plains, NY 10601

*For Defendant EgyptAir:*
RANDALL R. CRAFT, ESQ.
Holland & Knight
195 Broadway
New York, NY 10007

**BLOCK, District Judge:**

       This is a declaratory judgment action brought by Boeing against EgyptAir

and MISR Insurance Company ("MISR"), EgyptAir's insurer; the action is an outgrowth

of the EgyptAir Flight 990 crash on October 31, 1999, into the Atlantic Ocean near

Nantucket Island, Massachusetts, resulting in the death of all 217 individuals on board.

Prior to this action, MISR initiated a subrogation action against Boeing in an Egyptian court. Notwithstanding the pending action in Egypt, Boeing seeks a declaratory judgment in this Court that EgyptAir, MISR and MISR's reinsurers are barred by various contracts from recovering damages from Boeing arising from the loss of Flight 990 or, alternatively, that EgyptAir is liable to Boeing for subrogation damages sought by MISR and its reinsurers.

Pursuant to Fed. R. Civ. P. 12(b)(1), MISR has moved to dismiss Boeing's complaint for lack of subject matter jurisdiction based on the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330 & 1602 *et seq.*, and for lack of "minimum contacts" required by the Due Process Clause to exercise personal jurisdiction over MISR; alternatively, MISR has moved for a stay pending arbitration. In a supplemental filing, MISR has also moved to dismiss the complaint under the broad discretion accorded to the Court under the Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201.[1] For the reasons set forth below, MISR's motions are denied, and the Court will retain jurisdiction.

---

[1] EgyptAir has not made or formally joined in any of the motions; however, at oral argument held on February 8, 2005, the Court advised EgyptAir that it would be bound by the Court's resolution of the motions. *See* Tr. of Feb. 8, 2005, at 35. Thereafter, EgyptAir submitted a letter brief to the Court, urging the Court to decline to exercise jurisdiction under the DJA. *See* Letter from Randal R. Craft on behalf of EgyptAir (Mar. 1, 2005).

## BACKGROUND

### A. Contracts between Boeing and EgyptAir

In 1988, EgyptAir entered into a Purchase Agreement for, *inter alia*, the sale of the aircraft that later operated as EgyptAir Flight 990; the aircraft was built by Boeing, a United States corporate domiciliary, in the United States, and was regularly flown by EgyptAir in the United States. The Purchase Agreement also required Boeing to provide EgyptAir with various support services in connection with the sale. In 1997, Boeing entered into a second contract with EgyptAir, entitled Customer Services General Terms Agreement ("CSGTA"), for the sale and lease of, *inter alia*, "spare parts, standards, tools, [m]aterials . . . , services and retrofit kit changes . . . ." CSGTA at i (attached as Ex. C to Compl.). Both contracts specified that they would be governed by the laws of the State of Washington.

In each contract, Boeing provided certain warranties against defects and, in exchange, in a provision entitled "Disclaimer and Release," EgyptAir agreed to waive all other warranties, obligations and liabilities of Boeing, expressly including, *inter alia*, "any obligation, right, claim or remedy in tort, whether or not arising from the negligence of Boeing." Purchase Agreement, Ex. B, Part D-1 (attached as Ex. B to Compl.); *see also* CSGTA ¶ 12.1.

These contracts also required EgyptAir (1) to indemnify Boeing and hold it harmless under certain circumstances for any injury to or death of any person, or loss of or damage to any property, including the aircraft; (2) to have Boeing named as an

3

additional insured on EgyptAir's aviation liability insurance policy, and (3) to have its hull insurance carrier waive all rights of subrogation against Boeing. Additionally, EgyptAir was required to provide Boeing with certificates of insurance evidencing that EgyptAir had complied with the indemnification provisions, and to keep the certificates "current and valid." Purchase Agreement, Ex. C, Part E.

## B. EgyptAir's Insurance Policy

At all relevant times, MISR, which is wholly owned by the Arab Republic of Egypt, provided EgyptAir aviation liability and hull insurance pursuant to a single Hull and Liability Policy that was renewed annually. In this policy MISR agreed to insure against "loss, damage, liability or expense occurring" during the time of coverage and to waive all rights of subrogation against "each of the parties comprising the Assured." Hull and Liability Policy at 1 (attached as Ex. A to Decl. of Hussein Attalla Hussein). Although the cover page of the policy only identified EgyptAir as the Assured, the policy extended coverage to "incorporate [the] requirements [in contracts between Boeing and EgyptAir]," *id.* at 12, requiring, as previously noted, that the aviation liability policy that EgyptAir was obliged to obtain would name Boeing as an additional insured, and that the requisite hull insurance policy would provide for the waiver of subrogation.

The Hull and Liability Policy also included an arbitration clause requiring all disputes "arising between the Assured and [MISR] with reference to the interpretation of this Policy or the rights with respect to any transaction involved" to be

4

referred to arbitration "in accordance with the Statutory Rules for Arbitration in [Egypt]." *Id.* at 13.

On July 18, 1989, EgyptAir obtained a certificate of insurance from MISR certifying that MISR had agreed "to add Boeing as an additional assured under hull and liabilities policy no. 1710/89 [the policy number that was in place as of that date] and waive[ ] . . . subrogation in respect of" the subject aircraft. Decl. of Harold G. Booker ¶2 & Ex. A. The certificate also incorporated by reference "all other terms and conditions [of] Hull and Liabilities Policy No. 1710/89." *Id.* at Ex. A.[2] Thereafter, Boeing delivered the aircraft to EgyptAir.

## C. Requirements for Foreign Air Carriers

As required by United States Department of Transportation ("DOT") regulations, EgyptAir obtained a Foreign Air Carrier Permit from the DOT to engage in commercial air transportation in the United States; the permit provided "that operations under this permit constitute a waiver of sovereign immunity[.]"[3] In further compliance with DOT regulations, EgyptAir thereafter had its insurer, MISR, file with the DOT a

---

[2] Hull and Liability Policy 1710/89, which was in place at the time the certificate was issued, was technically a one-year policy; at each annual expiration date, it was renewed. However, new certificates of insurance were never issued; consequently, MISR argues that no liability can attach by reason of the certificate since it only applied to the original Hull and Liability Policy and not to any renewals. *See* Tr. of Feb. 8, 2005, at 19-20. The Court need only address this issue if it determines that the certificate of insurance, rather than the underlying contracts between Boeing and EgyptAir, governs MISR's rights and obligations.

[3] Although the Court has not been provided with a copy of the permit, it is undisputed that EgyptAir has waived its immunity under the FSIA.

Foreign Air Carriers Certificate of Insurance certifying that it issued a policy of aircraft liability insurance to EgyptAir for the subject aircraft. *See* Foreign Air Carriers Certificate of Insurance (attached as Ex. A to Compl.).[4]

**D. EgyptAir Flight 990 Litigation**

Flight 990 was flying from the United States to Cairo when it crashed. After the crash, numerous lawsuits were commenced against EgyptAir and/or Boeing; in every suit against Boeing, a third-party complaint or cross-claim was brought by Boeing against EgyptAir seeking indemnification and contribution. These lawsuits were later consolidated as multi-district litigation and transferred to this Court for the resolution of pre-trial matters. EgyptAir agreed not to contest liability where jurisdiction and venue were proper and settled many of these lawsuits, although it reserved the right to seek contribution or indemnification. As required by the Hull and Liability Policy, MISR also compensated EgyptAir for the value of the aircraft.

Thereafter, EgyptAir and MISR filed separate actions against Boeing in Egyptian courts. EgyptAir sued Boeing in the North Cairo Court of the First Instance, seeking to compel Boeing to, *inter alia,* produce documents related to the investigation into the cause of the crash. Boeing's counsel has advised the Court that on March 28, 2005, "the Egyptian court held that jurisdiction did not exist under Article 30, paragraph 2, of the Egyptian Procedural Code because the Case is not related to an asset existing in

---

[4] The Foreign Air Carriers Certificate of Insurance is separate and apart from the certificate of insurance that MISR issued to EgyptAir in satisfaction of EgyptAir's obligation under its contracts with Boeing.

Egypt or an obligation that arose, was performed or should have been performed in Egypt." Letter from Scott F. Seablom on behalf of Boeing (Apr. 5, 2005), at 1 (internal citations and quotations omitted). Accordingly, the case was dismissed.

MISR, as EgyptAir's subrogee, initiated a subrogation action against Boeing in the North Giza Court of the First Instance, seeking, *inter alia*, damages for the amount that it paid to EgyptAir on the hull insurance ($53 million) and the amount that it has paid thus far to the victims' families ($63 million). This is the action that forms the basis for MISR's supplemental motion requesting that the Court dismiss the declaratory judgment action.[5]

The basis for the subrogation action is MISR's contention that the Flight 990 crash was caused by a defect in the elevator control system; MISR asserted two bases for Boeing's liability: (1) that it designed and manufactured a defective product, and (2) that it failed to warn of the known defect.[6] MISR also alleged that pursuant to Article 67 of the Egyptian Commercial Code, tort liability may not be waived even if a contract expressly provides otherwise. The Court has been advised by both Boeing's and MISR's counsel that Boeing had challenged the Egyptian court's jurisdiction, but that the court ruled that it had jurisdiction because the aircraft was registered in Egypt.

---

[5] Since MISR's Egyptian action is one only for subrogation, MISR did not join EgyptAir as a party to that action.

[6] In a report published in March 2002, the United States National Transportation Safety Board ("NTSB") found the aircraft's "nose-down movements did not result from a failure in the elevator control system or any other airplane failure"; rather they "were the result of the relief first officer's manipulation of the controls." Compl. ¶ 32.

*See* Letter from Frederick Alimonti on behalf of MISR (Feb. 11, 2005); Letter from Scott F. Seablom on behalf of Boeing (Mar. 1, 2005), at 8. According to Boeing's counsel, MISR thereafter requested that the Egyptian court direct a panel of experts to investigate the cause of the accident, which would require "a lengthy investigation." Letter from Scott F. Seablom (Mar. 1, 2005), at 14. As the Court was recently advised in a subsequent letter from Boeing's counsel, the Egyptian court has permitted Boeing to add EgyptAir as a party to this litigation but has "ruled that it would not address any legal issues raised by the joinder of EgyptAir until after the panel of appointed experts complete[d] its investigation. . . ." Letter from Scott F. Seablom (Sept. 27, 2005), at 2.

In the present declaratory judgment action, Boeing seeks resolution of its liability as the manufacturer of the aircraft. Specifically, Boeing seeks a declaratory judgment that (1) the disclaimer and release, and the indemnity provisions in the Purchase Agreement and CSGTA bar EgyptAir, MISR and its reinsurers from seeking to recover any damages from Boeing arising from the loss of Flight 990; (2) either "[MISR] and its reinsurers are barred from subrogating against Boeing[,]" or, alternatively, "EgyptAir is liable to Boeing for all subrogation damages sought by [MISR] and its reinsurers"; and (3) EgyptAir, MISR and its reinsurers are barred from seeking damages against Boeing because they failed to raise these claims as compulsory counterclaims as required by Fed. R. Civ. P. 13(a). Compl. at 19-20.

# DISCUSSION

## A. Foreign Sovereign Immunities Act

"The FSIA . . . provides the sole basis for obtaining [subject matter] jurisdiction over a foreign sovereign in the United States." *Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230, 236 (2d Cir. 2002) (alterations in original) (quoting *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 611 (1992)). Section 1330(a) of Title 28 provides that federal district courts

> shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title or under any applicable international agreement.

It is undisputed that MISR is a foreign state as defined by 28 U.S.C. § 1603(a). [7]

A foreign state is not entitled to immunity pursuant to 28 U.S.C. § 1605(a) in any case:

> (1) in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver [hereinafter, "waiver exception"]; [or]

---

[7] 28 U.S.C. § 1603(a) defines a "foreign state" as "a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b)." Subsection (b) defines an "agency or instrumentality of a foreign state" as "any entity - (1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and (3) which is neither a citizen of a State of the United States . . . , nor created under the laws of any third country."

9

(2) in which the action is based [a] upon a commercial activity carried on in the United States by the foreign state; or [b] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [c] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States [hereinafter, "commercial-activity exception"][.]

Boeing argues that MISR is not immune from jurisdiction on both waiver and commercial-activity grounds. The Court agrees.

The declaratory judgment action involves actions by MISR in two separate roles: its role in naming Boeing as an additional assured, and its role as EgyptAir's subrogee; thus, the Court will analyze whether MISR is subject to jurisdiction under the FSIA in both roles. In regard to its naming Boeing as an additional assured, MISR is subject to jurisdiction under the third clause of the commercial-activity exception;[8] in regard to its role as EgyptAir's subrogee, MISR waived immunity.

## 1. Commercial-Activity Exception

"For a defendant foreign state to be amenable to jurisdiction under the third clause, the lawsuit for which jurisdiction is sought must be (1) 'based . . . upon an act outside the territory of the United States'; (2) 'that was taken in connection with a commercial activity of [the foreign state] outside this country'; and (3) 'that caused a

---

[8] Since the Court determines that MISR is subject to the Court's jurisdiction under the third clause of the commercial-activity exception, it need not address Boeing's arguments that MISR is also subject to jurisdiction under the first or second clause of that exception.

10

direct effect in the United States.'" *Virtual Countries, Inc.*, 300 F.3d at 236 (alterations in original) (quoting *Weltover*, 504 U.S. at 611).

### a. Based upon an act outside the United States

In *Saudi Arabia v. Nelson*, the Supreme Court construed the phrase "based upon" as meaning "those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case." 507 U.S. 349, 357 (1993). The Court continued, "something more than a mere connection with, or relation to, commercial activity" is required. *Id.* at 358. The Second Circuit subsequently determined that a "but for" causal relationship, while required, was not sufficient, *see Transatlantic Shiffahrtskontor GMBH v. Shanghai Foreign Trade Corp.*, 204 F.3d 384, 390 (2d Cir. 2000), and ruled that "there must be a significant nexus . . . between the commercial activity in [the foreign state] upon which the exception is based and a plaintiff's cause of action." *Reiss v. Societe Centrale du Groupe des Assurances Nationales*, 234 F.3d 738, 747 (2d Cir. 2000).

Boeing has established the requisite significant nexus to acts taken outside the United States; Boeing's claims are intertwined with the Hull and Liability Policy issued to EgyptAir by MISR that named Boeing as an additional assured by expressly incorporating the terms of Boeing's agreements with EgyptAir (*i.e.*, the Purchase Agreement and the CSGTA).

### b. Taken in Connection with a Commercial Activity Outside the United States

"A 'commercial activity' means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an

11

activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). MISR's issuance of the Hull and Liability Policy was clearly a commercial activity, and the incorporation of the terms of Boeing's agreement with EgyptAir in this insurance policy was "taken in connection" with this commercial activity.

### c. Direct Effect in the United States

> [A]n effect is direct if it follows as an immediate consequence of the defendant's activity. Immediacy implies no unexpressed requirement of substantiality or foreseeability, but rather ensures that jurisdiction may not be predicated on purely trivial effects in the United States. Congress did not intend to provide jurisdiction whenever the ripples caused by an overseas transaction manage eventually to reach the shores of the United States.

*Virtual Countries, Inc.*, 300 F.3d at 236 (internal citations and quotations omitted). MISR's Hull and Liability Policy had a direct effect in the United States by providing insurance coverage to Boeing for the plane that it manufactured and was flown in the United States. *See Dumont v. Saskatchewan Gov't Insurance*, 258 F.3d 880, 884 n.6 (8th Cir. 2001) (Insurance-provider defendant "acted outside the territory of the United States in connection with a commercial activity . . . that caused a direct effect in the United States[, which was] the provision of automobile liability and family security insurance coverage to [the plaintiffs] while they traveled by automobile in the United States." (internal citations omitted)).

## 2. Waiver

As EgyptAir's subrogee, MISR is subject to jurisdiction under the waiver exception since it stands in EgyptAir's shoes; thus, it is bound by EgyptAir's express waiver of sovereign immunity in its Foreign Air Carrier Permit. *See American Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2d Cir. 1999) ("It is clearly established that 'an insurer stands in the shoes of its insured.'" (quoting *Gibbs v. Hawaiian Eugenia Corp.*, 966 F.2d 101, 106 (2d Cir. 1992))); *Farrell Lines Inc. v. Columbus Cello-Poly Corp.*, 32 F. Supp. 2d 118, 126 (S.D.N.Y. 1997) ("It is axiomatic that a subrogee stands in the shoes of the subrogor and possesses no greater rights under the contract than the subrogor." (citations and quotations omitted)).

## B. Minimum Due Process Contacts

Although "[i]n general, subject matter jurisdiction plus service of process equals personal jurisdiction under the FSIA[,]" *United States Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135, 151 (2d Cir. 2001) (internal citations and quotations omitted), MISR correctly argues that "personal jurisdiction under the FSIA must also comport with the notions of the Due Process Clause . . . ." *Id.* at 152. In that regard, MISR contends that jurisdiction is wanting because there are not sufficient "minimum contacts" as required by *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

The Court disagrees.[9] The Second Circuit has summarized the requirements to establish personal jurisdiction under the Due Process Clause:

> [T]he plaintiff first must show that his claim arises out of or relates to defendant's contacts with the forum state. The plaintiff must also show that the defendant purposefully availed himself of the privilege of doing business in the forum state and that the defendant could foresee being haled into court there. If the plaintiff satisfies these requirements, the court also considers whether the assertion of jurisdiction comports with traditional notions of fair play and substantial justice -- that is, whether it is reasonable under the circumstances of a particular case.

*Chew v. Dietrich*, 143 F.3d 24, 28 (2d Cir. 1998) (alterations, citations, and quotations omitted). "In determining whether personal jurisdiction exists over a foreign defendant who, [as here], has been served under a federal service of process provision, a court should consider the defendant's contacts throughout the United States and not just those contacts with the forum." *United States Titan, Inc.*, 241 F.3d at 152 n.12 (internal citations omitted).

The same factors that the Court has relied upon in rejecting MISR's claim of immunity under FSIA also obviously satisfy the first prong of the due process inquiry -- that plaintiff's claim arises out of or relates to MISR's contact with the United States. Similarly, they drive the second prong because by adding Boeing, a corporation

---

[9] In so holding, the Court will assume, without deciding, that a foreign state constitutes a 'person' under the Due Process Clause, an issue that has yet to be resolved by the Supreme Court or the Second Circuit. *See Weltover*, 504 U.S. at 619 (Court "assum[ed], without deciding, that a foreign state is a 'person' for purposes of the Due Process Clause[.]"); *see also Hanil Bank v. PT. Bank Negara Indonesia*, 148 F.3d 127, 134 (2d Cir. 1998) (noting that the issue was left open in *Weltover* and declining to "resolve the exact status of a foreign sovereign for due process analysis").

domiciled in the United States, as an additional insured, so that its insured, EgyptAir, could purchase an aircraft from Boeing, MISR purposefully availed itself of the privilege of conducting activities within the United States. *See McDermott Inc. v. Amclyde*, 1994 WL 236387, at *4 (E.D. La. May 24, 1994) ("[T]he Court finds that the [defendants] purposefully availed themselves of the privilege of conducting business in Louisiana by naming McDermott, a Louisiana corporation, as an additional assured in the insurance policy it issued to Bugsier. By naming McDermott as an additional assured, the [defendant] should have anticipated the possibility of being haled into court in Louisiana. Therefore, the first prong of the due process test is satisfied.").

MISR's reliance on *Josefson v. Flagship Airlines, Inc.*, 95-CV-493 (M.D.N.C. 1997), is misplaced. In *Josefson*, the district court found that it lacked personal jurisdiction over three foreign aircraft manufacturers that were named in a lawsuit stemming from an American Airlines crash. The court held that the defendants never purposefully availed themselves of doing business in North Carolina; they merely introduced their aircraft into the stream of commerce, which was not sufficient to establish personal jurisdiction. Providing insurance to a company in the United States is more than simply introducing a product into the stream of commerce.

As for the last prong, exercising personal jurisdiction over MISR comports with "fair play and substantial justice." Five factors are considered in this analysis:

> the burden on the defendant, . . . the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, . . . the interstate judicial system's interest in obtaining the most efficient resolution of

15

> controversies, and the shared interest of the several States in
> furthering fundamental substantive social policies.

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980). The United States has

a substantial interest in adjudicating this dispute: Boeing is a United States corporation;

both the Purchase Agreement and the CSGTA, which each required Boeing to be added

as an additional assured by MISR, are governed by United States law; and the Court has

already engaged in substantial litigation regarding the EgyptAir Flight 990 crash.

## C. Arbitration

MISR argues that should the Court retain jurisdiction the action should be

stayed pending arbitration because the Hull and Liability Policy provides that all

disputes "arising between the Assured and the Company with reference to the

interpretation of this Policy or the rights with respect to any transaction involved" be

referred to arbitration; MISR puzzlingly claims, without explanation, that the coverage

afforded to Boeing under the Hull and Liability Policy was somehow limited, and that

the limited coverage does not extend to the Flight 990 crash. Boeing argues that it is not

bound by this arbitration clause because it never agreed to submit to arbitration and,

even if it is bound, the Court can issue a declaratory judgment "without ever reaching

Boeing's status as an additional insured." Boeing Mem. at 38.

Although generally "a party cannot be required to submit to arbitration

any dispute which he has not agreed to submit[,] . . . a nonsignatory party may be

bound to an arbitration agreement if so dictated by the ordinary principles of contract

and agency." *Thomson-CSF v. American Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995).

16

For example, "[a] party is estopped from denying its obligation to arbitrate when it receives a direct benefit from a contract containing an arbitration clause." *Tencara Shipyard S.P.A.*, 170 F.3d at 353 (citation omitted). Because Boeing received a direct benefit from the Hull and Liability Policy (*i.e.*, it was insured by MISR), it may be bound by its arbitration clause should it be necessary to interpret the Hull and Liability Policy to determine the scope of coverage afforded to Boeing; however, this would only be required if the Court were to determine that the underlying contracts between EgyptAir and Boeing were not determinant of the parties' rights; consequently the arbitration issue is not ripe for adjudication.[10]

## D. The Declaratory Judgment Act

The Declaratory Judgment Act ("DJA") provides in pertinent part:

> In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a).

---

[10] Boeing argues, however, that the Court would never have to address the application of the arbitration clause under the Hull and Liability Policy because (1) MISR expressly waived subrogation rights in its certificate of insurance, which, at least on its face, is not part of the Hull and Liability Policy, and (2) MISR, as Boeing's insurer, is barred from subrogating against its own insured; this alternative argument is also not ripe for adjudication.

## 1. Actual Controversy

The actual controversy requirement under the DJA incorporates "the case or controversy limitation on federal jurisdiction found in Article III of the Constitution." *Niagara Mohawk Power Corp. v. Tonawanda Band of Seneca Indians,* 94 F.3d 747, 752 (2d Cir. 1996). The Supreme Court explained the "actual controversy" requirement set forth in the DJA in *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273 (1941):

> The difference between an abstract question and a 'controversy' contemplated by the [DJA] is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy. Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

Although MISR states that it will "assum[e] . . . that there is an actual controversy[,]" Letter from Frederick Alimonti on behalf of MISR (May 12, 2004), at 1, the Court has a *sua sponte* obligation to address jurisdictional issues. *See Binder & Binder PC v. Barnhart,* 399 F.3d 128 (2d Cir. 2005) (*sua sponte* considering jurisdiction); *Brunson v. Clark,* 1996 WL 559965, at *3 (S.D.N.Y. Oct. 1, 1996) (dismissing DJA action for lack of jurisdiction after *sua sponte* considering whether there was a case or controversy). It is clear that there is a controversy: the parties dispute Boeing's liability with respect to Flight 990 in light of the Purchase Agreement and the CSGTA; moreover, MISR has commenced a subrogation proceeding against Boeing notwithstanding the anti-subrogation provision included in the certificate of insurance that MISR provided to Boeing.

18

## 2. Discretionary Nature of DJA Jurisdiction

### a. Standard

In *Wilton v. Seven Falls Co.*, 515 U.S. 277, 289 (1995), the Supreme Court reaffirmed its holding in *Brillhart v. Excess Ins. Co. of America*, 316 U.S. 491 (1942), that a district court has broad discretion under the DJA to determine whether it would entertain a declaratory judgment action in the face of a pending parallel *state* proceeding. Because of the DJA's "textual commitment to discretion," the Court in *Wilton* noted that it had always understood that the DJA's "breadth of leeway" distinguished it "from other areas of the law in which concepts of discretion surface." *Wilton*, 515 U.S. at 286-87. It has chosen, however, not to "delineate the outer boundaries of that discretion[,]" preferring to adhere to a case-by-case approach. *Id.* at 290. The Court noted the general proposition that "the propriety of declaratory relief in a particular case will depend upon a circumspect sense of its fitness informed by the teachings and experience concerning the functions and extent of federal judicial power." *Id.* at 287 (internal citation and quotations omitted). In that regard, the Court counseled that "[i]n the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration." *Id.* at 288. Finally, the Court recognized that appellate review would be limited to abuse of discretion. *See id.* at 289.

Although *Wilton* involved a parallel *state* proceeding, the Second Circuit, in *Farrell Lines Inc. v. Ceres Terminal Inc.*, 161 F.3d 115, 117 (2d Cir. 1998), applied its

holding in assessing whether the district court properly exercised its discretion in the

context of a parallel *foreign* proceeding. And in *Dow Jones & Co. v. Harrods Ltd.*, 346 F.3d

357 (2d Cir. 2003), the Second Circuit gave its approbation to the district court's reliance

on the following five factors culled from prior precedents governing parallel state

proceedings, notwithstanding that the parallel proceeding was a foreign action:

> (1) whether the judgment will serve a useful purpose in
> clarifying or settling the legal issues involved; (2) whether a
> judgment would finalize the controversy and offer relief
> from uncertainty; . . . [3] whether the proposed remedy is
> being used merely for procedural fencing or a race to res
> judicata; [4] whether the use of a declaratory judgment
> would increase friction between sovereign legal systems or
> improperly encroach on the domain of a state or foreign
> court; and [5] whether there is a better or more effective
> remedy.

*Id.* at 359. Although the circuit court did not hold that these were the only factors that

may be considered in a given case, they nonetheless serve as a benchmark to guide the

Court in the present case.

### b. Relevant Caselaw

There is a limited body of published caselaw addressing the exercise of a

court's discretion under the DJA in the face of a parallel foreign proceeding. The parties

have only referenced *Farrell* and *Dow Jones*;[11] Boeing relies on *Farrell*, where the Second

Circuit affirmed the district court's holding in favor of retaining jurisdiction; MISR

---

[11] Boeing also cites an unpublished district court decision, *Vickers Aerospace Marine Defense v. Air Mauritius Ltd.*, CV 00-910 (S.D.N.Y. Nov. 7, 2003). However, in *Vickers* the court dismissed the action after finding that no case or controversy existed, and never reached the question of whether it should exercise its discretion under the DJA.

believes that *Dow Jones*, where the Second Circuit affirmed the district court's decision to decline to exercise its jurisdiction, is more apt. There are only two additional published decisions, each out-of-circuit district court cases, *Basic v. Fitzroy Engineering, Ltd.*, 949 F. Supp. 1333, 1338 (N.D. Ill. 1996) (declining to exercise jurisdiction), and *Eastman Kodak Co. v. Kavlin*, 978 F. Supp. 1078, 1090 (S.D. Fla. 1997) (same). Upon analysis, there are two circumstances that these four cases share in common that point the Court in the direction it should travel in assessing the weight to be accorded to the five relevant factors in the present case: in each case the forum that the court determined, in the exercise of its declaratory judgment discretion, to be the appropriate forum, was the forum where the underlying dispute had its principal origins and the primary controlling legal issues were to be governed by the substantive law of that forum.

Thus, in *Basic*, a New Zealand company had entered into a construction contract with the Auckland (New Zealand) International Airport to construct a waste incinerator at the airport; in turn, it contracted with an American company to design, manufacture, and supervise its installation. *See Basic*, 949 F. Supp. at 1335. The New Zealand company sued the American company in New Zealand on the ground that the American company made negligent misrepresentations to the New Zealand company under New Zealand law. *See id.* The American company then sought a declaratory judgment in the United States District Court for the Northern District of Illinois that any judgment that might be obtained against it in the New Zealand litigation would not be

enforceable in the United States because, *inter alia*, (1) a prior arbitration award barred the New Zealand company from filing the New Zealand lawsuit, (2) New Zealand lacked jurisdiction over the American company, and (3) the New Zealand company's claim for negligent misrepresentation under New Zealand law was not cognizable under Illinois law. *See id.* Although the district court held that there was no actual case or controversy because it was not at all certain that such a judgment would be obtained, it ruled, in the alternative, that it would not entertain the declaratory judgment action, applying the five factors that were ultimately embraced by the Second Circuit in *Dow Jones. See id.* at 1338.

In doing so, the district court stated that the declaratory judgment action was simply a strategic attempt to persuade the New Zealand court not to resolve the merits of the litigation under New Zealand's substantive and jurisdictional laws; that it was a premature attempt "to beat [the foreign litigant] to the court clerk's office before [it] had the opportunity to obtain a foreign judgment and proceed to confirm it in a United States District Court"; that the better alternative, should such a judgment ever be obtained, would be to challenge its enforcement in the United States under the Uniform Foreign Money-Judgments Recognition Act; that, given the contingency nature of the litigation and the unlikelihood that the New Zealand court would decline to adjudicate a case appropriately brought in its courts and subject to its substantive and jurisdictional laws, the declaratory judgment would not serve a useful purpose; and that where "the foreign action is pending rather than decided, comity counsels that

22

priority generally goes to the suit filed first." *Id.* at 1339-41 (internal citations and quotations omitted).

In a similar vein, in *Eastman Kodak* the district court rejected Kodak's effort to seek a declaratory judgment that it was not be held liable to the defendant, a Bolivian company, for any relief that the defendant might obtain against Kodak in a pending lawsuit previously filed in a Bolivian court; in that lawsuit, the Bolivian company sought to enforce an agreement with Kodak making it an exclusive distributor of Kodak products in Bolivia. *See Eastman Kodak Co.*, 978 F. Supp. at 1090. The district court viewed Kodak as having "made its bed in Bolivia," *id.* at 1085, and embraced the principal reasoning of *Basic* in ruling that it saw no reason why, as in *Basic*, it should not, under principles of comity, dismiss a declaratory judgment action "seeking an adjudication of rights bound up in a previously filed action in a foreign nation, . . . in order to preempt the effect of a possible adverse judgment in [that nation]." *Id.* at 1089-90.

*Dow Jones* also involved litigation owing its underpinnings, as in *Basic* and *Eastman Kodak*, to events occurring in the foreign jurisdiction. There the declaratory judgment action sought to preempt an anticipated defamation lawsuit against Dow Jones in London, which was indeed subsequently initiated, based upon a press release issued in England; the declaratory judgment action claimed that if such an action were to be pursued in the United States, it would be "summarily dismissed under federal and state constitutional law . . . because the publication comprise[d] only the author's

23

non-actionable expression of opinion based on true statements and contain[ed] no facts capable of being proved false." *Dow Jones & Co.*, 237 F. Supp. 2d at 402. By contrast, Dow Jones argued, the British action would not be barred under British law. *See id.* at 402-03.

The district court first ruled that these circumstances neither presented a case that was ripe for adjudication nor gave rise to a case or controversy under the DJA because "a tactically preemptive purpose of declaring non-liability so as to guard against a tort action brought by a foreign national in a court of another country and arising under foreign law, is not within the contemplated purposes of the DJA." *Id.* at 427. It further ruled, in the alternative, that it would decline to exercise its jurisdictional discretion under the DJA. *See id.* at 432.

In that regard, the district court applied the five factors thereafter approved by the Second Circuit on appeal, noting, preliminarily, the Supreme Court's admonition in *Wilton* that the benchmark should be "considerations of practicality and wise judicial administration." *Id.* at 437. Turning to the relevant factors, it first noted that the action subsequently brought in London was "grounded on the application of British law[,]" and that the American lawsuit was not designed to effect "a speedy, efficient and economical resolution of the merits of the dispute"; rather, it was prompted "by tactical maneuvering designed to undermine the exercise of judicial authority by a British court in a matter properly within its jurisdiction." *Id.* at 437. Furthermore, the district court discounted the notion that a useful purpose would be

served by the declaratory judgment action since while "such a judgment arguably may settle Dow Jones' rights and remove uncertainties concerning the enforceability of a damage award and future publication of [the defamatory material] in the United States, it [was] unlikely to do much to dispose of [the London plaintiff's] claims in London or elsewhere beyond this country"; consequently, it viewed the declaratory judgment action as "amount[ing] to strategic forum-shopping motivated by pursuit of a tactical edge over an opponent." *Id.* at 439-40.

The district court further concluded that Dow Jones' tactic to undermine the London lawsuit would also be antithetical to the principles of comity, even though, unlike *Basic* and *Eastman Kodak,* the declaratory judgment action was the first action to be filed. *See id.* at 441. In that regard, the court noted that "[t]he Supreme Court's ruling in *Wilton* may be read to instruct that there can be no mechanistic accrual of rights that attaches by reason of reaching the courthouse first, or indeed of engaging in a race at all." *Id.* at 443. In conclusion, it explained:

> should the London Action produce a judgment based on application of principles that would vitiate public policies of the United States, Dow Jones will then accrue a justiciably ripe occasion to challenge in a United States jurisdiction any effort to enforce the judgment on the substantive grounds it prematurely interposes here. In sum, Dow Jones will have ample opportunity to exercise its right to its day in court, the same right the outcome of this action would effectively deny to its opponent were Dow Jones' strategy to prevail here.

*Id.* at 446-47.

On appeal, the Second Circuit affirmed on the ground that the district court, in the exercise of the broad grant of discretion accorded to district courts under the DJA, did not abuse its discretion in declining to exercise DJA jurisdiction. *See Dow Jones & Co.*, 346 F.3d at 360. In doing so, the circuit court, noting that its authority was limited to reversal only for abuse of discretion, summarily approved the district court's analysis of the application of the five-factor test. *See id.*

*Farrell* is the only case where declaratory judgment jurisdiction was retained in the face of a competing pending foreign litigation; moreover, the defendants were enjoined from pursuing their foreign lawsuit.[12] *See Farrell Lines Inc.*, 161 F.3d at 116. Although the declaratory judgment action was the first to be filed, this was not the reason the district court retained jurisdiction; rather, unlike *Basic, Eastman Kodak* and *Dow Jones*, the litigants' relationship, as here, stemmed from events and circumstances originating in the United States, and the resolution of their rights were to be governed by United States law.

The foreign lawsuit, as in the present case, was a subrogation action by foreign insurance companies; thus, their rights could not be greater than the rights of their insured. *See Farrell Lines Inc.*, 32 F. Supp. 2d at 126. Those rights were governed by the provisions of a bill of lading issued by the plaintiff in the declaratory judgment action, a Delaware corporation with its principal place of business in New York, for a shipment by the insured of certain cargo from Italy to the United States on an

---

[12] Unlike the plaintiff in *Farrell*, Boeing has not sought to enjoin MISR from pursuing its foreign action.

American-flag merchant vessel owned and operated by the plaintiff. *See id.* at 122. The bill of lading provided that liability would be governed by the limitations of liability for cargo claims under the Carriage of Goods by Sea Act of the United States ("COGSA"); it further provided that it "shall be construed according to the laws of the United States" and that "the shipper," as well as any "consignee and holder . . . agree[d] that any suits against the Carrier shall be brought in the United States District Court for the Southern District of New York." *Id.* at 123.

The cargo was damaged after it had been off-loaded by the vessel's stevedore in the United States and strapped to a chassis that tipped over and hit the ground as it was being driven from the pier; the insurance companies, mainly comprising foreign corporations, paid their insured a sum of money significantly in excess of the limited liability under COGSA and thereafter initiated their subrogation action, in Italy, after the plaintiff brought its declaratory judgment action against the insured and its insurers in the district court designated in the bill of lading seeking a declaration that its liability was governed by COGSA; by contrast, in their foreign subrogation action, the insurers claimed that under Italian law they were not bound by COGSA's liability limitations under the bill of lading; nor were they required to litigate their subrogation claim in the United States forum designated in the bill of lading. *See id.*

In exercising its discretion to retain jurisdiction over the declaratory judgment action, the district court did not employ an elaborate analysis or evaluate the

case under each of the factors subsequently endorsed by the Second Circuit in *Dow Jones, see id.* at 124; rather, as recounted in the circuit court's affirmance, it simply held that "[e]ven if plaintiff filed this action in anticipation of defendant insurers' action in Italy, that would not be improper" because "plaintiff filed suit seeking resolution of a real controversy[,]" namely whether its liability was governed by COGSA or Italian law, "in the forum designated by the Bill of Lading." *Farrell Lines, Inc.*, 161 F. 3d at 117 (quoting *Farrell Lines, Inc.*, 32 F. Supp. 2d at 124). For the same reason, the district court also rejected the defendants' contention that the plaintiff was improperly using the DJA remedy to forum shop; furthermore, it held that declaratory relief would not be barred even if the Italian action offered an adequate remedy since a district court "has discretion to grant a declaratory judgment on an issue that is pending in another court." *Farrell Lines, Inc.*, 32 F. Supp. 2d at 125 (internal citation and quotations omitted).

Having decided to exercise its declaratory judgment jurisdiction, the district court also reached the merits.[13] It determined that the bill of lading was binding on the shipper even though it was not a signatory to it, and was also binding on the insurers once they became subrogated because they "step[ped] into the insured's shoes and essentially bec[ame] a party to the Bill of Lading"; thus, their "right[] of recovery from the carrier of the goods [was] governed by the same terms as the insured's right of recovery, *i.e.* by the Bill of Lading." *Id.* at 127-28. The district court

---

[13] The merits of the declaratory judgment action in the present case are not now before the Court.

28

then determined that COGSA's limitation of liability was applicable even though the damages occurred after the discharge of the cargo. *See id.* at 129.

Finally, the district court determined that the plaintiff was entitled to enjoin the defendants from maintaining their foreign litigation because they "acted in bad faith by bringing suit in Italy to evade COGSA and the Bill of Lading's forum selection clause"; consequently, principles of comity did not bar such relief. *Id.* at 131. In addition to affirming the district court's decision to retain declaratory judgment jurisdiction, the circuit court also, summarily, affirmed this aspect of the district court's judgment.[14] *See Farrell Lines Inc.,* 161 F.3d at 116.

*c. Application*

What, then, should be the bases for the Court's decision to retain jurisdiction over Boeing's declaratory judgment action? The Court's principal reason is that, as in *Farrell,* the defendant's subrogation rights are dependent upon the obligations of its insured: in *Farrell* they flowed from the binding nature of a bill of lading issued by a United States shipowner governing the shipment of cargo to be delivered to the United States on the shipowner's American-flag vessel; here they flow from the contract that EgyptAir entered into with Boeing for the purchase of a Boeing plane -- a contract

---

[14] In addition to the propriety of the district court's exercise of declaratory judgment jurisdiction and the issuance of the injunction, the only other issues raised by the defendants on appeal were the district court's rejection of their contentions that personal and subject matter jurisdiction were wanting; the circuit court also affirmed the district court on those issues. Thus, the merits of the district court's rulings on the binding effect of the bill of lading and the applicability of COGSA were not before the circuit court.

that had all of its roots in the United States and was to be governed by United States law. This overriding dynamic folds neatly into the fabric of the five factors adopted by the Second Circuit in *Dow Jones*.

It can hardly be argued that the declaratory judgment will not serve a useful purpose in settling MISR's rights in its Egyptian subrogation action since there is no basis to assume that the Egyptian court does not understand the basic principle governing subrogation claims -- that the subrogee's rights can be no broader than the rights of the subrogor -- and would refuse to apply basic principles of contract law; indeed, MISR has not offered any Egyptian authority to the contrary. *See Alfadda v. Fenn*, 149 F.R.D. 28, 34 (S.D.N.Y. 1993) ("[T]he party relying on foreign law bears the burden of [proving such law]." (citing *United States v. Vetco Inc.*, 691 F.2d 1281, 1289 (9th Cir. 1981))). Thus, the Egyptian court would need to construe EgyptAir's contractual rights and obligations under United States law because EgyptAir's contract with Boeing provides that Washington State law governs. A United States court is clearly better qualified to interpret the laws of its country than a foreign court. Since MISR has not offered any reasons why Egypt would not comply with this Court's interpretation and application of United States law, it is likely that the Court's declaratory judgment would resolve the Egyptian subrogation action, thereby finalizing the controversy and offering relief from uncertainty.

Given that American law is at the heart of the defendant's subrogation rights, the Court's resolution of such law could hardly be viewed as increasing friction

30

between the American and Egyptian legal systems or compromising principles of international comity. Indeed, considerations of comity are only relevant when "there is . . . a true conflict between domestic and foreign law." *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 798 (1993); *see also Maxwell Communications Group v. Societe Generale*, 93 F.3d 1036, 1049 (2d Cir. 1996) ("International comity comes into play only when there is a true conflict between American law and that of a foreign jurisdiction." (citing *Hartford Fire Ins. Co.*, 509 U.S. at 798)); *In re United Pan-Europe Communications N.V.*, 2004 WL 48873, at *4-5 (S.D.N.Y. Jan 09, 2004) (declining to dismiss a bankruptcy proceeding in spite of a second proceeding pending in the Netherlands because there was no "true conflict" where the contract at issue specified the law that governed it).

Finally, since it was entirely appropriate for Boeing to seek declaratory relief in a United States court, it cannot be accused of forum shopping; to the contrary, MISR has candidly acknowledged that forum-shopping was very much at the heart of its subrogation action. *See* Tr. of Feb. 8, 2005, at 27 ("MISR has elected to bring its claims in Cairo, where it feels it has a better chance of prevailing. . . . I think it's understandable that MISR would want its own home-field advantage, as it's understandable that Boeing would prefer that it does not."). Nor can it be said that MISR should be accorded any priority because it was the first to strike since, in light of MISR's waiver of its subrogation claims, Boeing can hardly be charged with anticipating that it would have to defend against such claims; under such circumstances, the bona fides of MISR's litigation is suspect and would raise a serious issue of whether, as in

*Farrell,* injunctive relief would, if requested, be appropriate. In any event, it could reasonably be argued that MISR was not the first to strike in light of the various cross-claims and third-party actions that Boeing has brought against EgyptAir seeking contribution and indemnification in the pending multi-district litigation before this Court, wherein EgyptAir's rights and obligations, upon which any subrogation claims could lawfully be based, could be subject to adjudication.

Accordingly, the provident exercise of the Court's discretionary powers counsels that it retain jurisdiction over Boeing's declaratory judgment action.

### CONCLUSION

Defendant MISR's motions are denied in their entirety.

**SO ORDERED.**

FREDERIC BLOCK
United States District Judge

Brooklyn, New York
September 30, 2005